Court of Appeals for the Federal Circuit is now open and in session. God save the United States in this honorable court. Good morning, everyone. The panel has before it four cases. One of them appeals 3322 Varela versus the Department of the Navy will be submitted today without argument on the basis of the briefs will hear argument first this morning in information systems versus United States appeal 5173 from 2008. Mr. Singer. Good morning to you. Welcome to the court. Please. May it please the court. This case comes before you on the finding by the trial court that there were no material issues of fact connected with the granting of the rule 56 motion. We challenge the trial court below and we have submitted in our briefs argument that there were material issues of genuine fact in this case. And I will use the template of the trial court in in setting forth what those issues were. Well, I don't doubt that there are there are issues in the case. It seemed like the deficiency was proof. It seemed like the trial judge held that you had essentially no proof on the required elements of your cause. And therefore, summary judgment was appropriate. So it seems like the response is no, no, we had lots of proof. And here's what it was. What was it? Well, let's go through that. We showed the trial court that there were three material changes in this contract. Were any of them in writing? Yes. The big one that we're talking about, of course, is the June 20th. That's the one that everything turns on. Am I correct? You mean the ECP of 1995? Yes. Well, that confirms both what had been transpiring and it confirms the changes that have been made. So that's a big one. That is a big one for this reason. One of the material changes. That's the big one. Is it in writing? That is in writing. Can you show me in the record where that is in written and where the contracting officer has agreed to it? No. Your Honor, I can't show you where the contracting officer has agreed to it because the theory of this case is that he doesn't necessarily have to sign a writing agreeing to it. We have no writing. That's why this is a constructive change case. If we had a writing, we would have a change under the contract. And we wouldn't need to be going on the constructive change theory. The whole point is we showed the trial court three material changes in the scope of this contract. We showed the trial court that the cabling in this case, which was originally bid at 3,000 feet, went to 5,000 feet, was originally six pair, 24 ports, went to 12 pair, which is 24 ports. Now, the government says we may not have known that. But the fact of the matter is, as that June 25, 1995 letter confirms, the 5,000 square feet of cabling 12 pair for that change came from the government. Doesn't the contract require a written change order? It does. If you're going to follow the protocol for changes in the contract, then we're not here arguing about a constructive change. But we are here arguing a constructive change because the protocols were not followed. Because the change provisions in the contract, including 52-243-1, were not followed. We have admitted that. And we don't contend that the contracting officer signed a writing consistent with the terms of the contract, which is why we argue constructive change. And which is why the trial court first said, well, you didn't show any material difference in the contract performance. We did. But if you're going to have a constructive change, you're going to have to have pretty solid evidence, more than solid evidence, that the contracting officer has consented to a different course of conduct. Where's that? Well, I'm not sure I agree with the overall analysis. Roscoe Crawford says throughout. I never see anything where he ever says he agreed to anything. He just says throughout. No, no, no, no. Except to answer that, your honor, somehow the new 12-pair cabling, rather than six, was delivered by the government to ISN. Now, when he says he had no knowledge of that, that meant he didn't read the June 25, 1995 letter, which confirms the delivery of the 12-pair cabling. And why isn't what he knows, to begin with. You don't need to raise your voice. You can hear me very well. But the point that he may not have read something still cuts against you. You have to have his consent. Aren't you kind of bound to have him read and consent before anything can go forward? Not if this is a constructive change case. We do not. I'm still trying to figure out how anything happens here without consent by the contracting officer. If we show a pattern of conduct by the contracting officer's technical representative, who is obligated to interface with the contracting officer, and if we show documents going to the contracting officer, which imputes knowledge to him, and if we show the changes made, which were made to this contract performance as a result of all that, the issue of fact is, what did the contracting officer know, and when did he know it? Let me ask you, if I could, I think what you're saying might have more force, were it not for the fact that the contract provisions in this case, and I'll say the standard contract provisions that we see in the FAR, are buttressed, if you will, by some provisions which make it very clear that you almost can't turn around and do anything different without the contracting and be entitled to more compensation unless the contracting officer approved this. I'm thinking of provision G2 of the contract. And to pick up on your discussion with Judge Rader, it just seems to me that the argument that you're making runs into these contract provisions that go beyond what's normally in a contract based on the FAR. Well, Your Honor, we have argued that in a constructive change context, regardless of how strong the contract provisions are, and perhaps they couldn't even be stronger than they are in this contract, that if we can demonstrate that changes were made, which we did to the trial court, that we were not paid for the changes, and that there was knowledge by the government of the changes that were made, and acceptance of the Hampton Road site with the changes, then we are entitled to a constructive change. But the problem here is the constructive change doctrine is sort of cabined, if you will, by these provisions, particularly, I think, again, of G2, which say that there's no change, constructive or otherwise, unless the contracting officer signs off on it. And you don't have that here. I think that's the problem with these unique contract provisions in this case. But I have not seen a case from this court where it has found that although the conduct of the government was part of this pattern or part of the change, but because of the contract provisions, you cannot have constructive change. I don't know how many cases we've had with these kind of – I mean, I haven't obviously sat on every panel where we've addressed this kind of issue, but this was the first case I've seen where you had these particular provisions. Well, and also in the case which I believe you wrote, Your Honor, this Contact International, Inc. v. Wignall, which was back in 1997, that is a case where your view of constructive change doesn't really deal necessarily with wrongful conduct as long as we can show there's no formal order under the changes clause. And if we have no formal order under the changes clause, which we admit we don't, and we have a change clause, which we admit we do, despite that, if we can show the material facts warranting a constructive change, then the court is entitled to grant it. Do you have an additional problem with the provision that requires you to give written notice within 20 days after the costs are incurred, written notice to the contracting officer, which evidently did not occur? I believe, Your Honor, going back to these project meeting minutes, we were within the 20 days when we were advising at least the technical representative, the contracting officer's technical representative who was there, as to the increase in costs. To answer your question, no, we have no communication to the contracting officer. Which is what's required, right? Which is required under the contract. But again, the constructive change doctrine, unless it's going to be held by this court that if you have these contract provisions, you can't use the doctrine. The doctrine doesn't apply as a matter of law, period. Which no decision so far has said. It said you look at the factual circumstances of each case to see whether it should be applied, which means that as a matter of evidence, the trial court is going to either be convinced that the contractor is entitled to something or convinced that he isn't. And that we never had a chance to present. Well, I'll tell you, I'm a little troubled by the greater context here where you receive more than $4 million payment on a $4.4 million contract and do less than 30% of the work. It's a little hard to see that you were greatly prejudiced by this whole process. Well, we were prejudiced to the extent that the DCAA confirmed that we had incurred costs of $4.5 million and then recommended the payment of the $4 million. The DCAA was convinced in its accounting that we had incurred those costs. But that's one of the elements of evidence which we were not allowed to expand on because of the grant of the summary judgment. Well, but the DCAA, I mean, you're correct in terms of what you've stated the DCAA found, I think, Mr. Singer. But the problem is the DCAA doesn't look to what I'll call the issue of entitlement. The DCAA just looks at, you know, did the contractor incur these costs? In other words, are the costs that are alleged supported by the records and so forth? And that doesn't mean that the contractor is entitled to compensation. And yet the cost, but it doesn't necessarily equate to compensation. And yet the Navy relied on that DCAA report in making the payment to ISN. And ISN and the DCAA was not required to audit these numbers to begin with. They were auditing the termination contract settlement proposal. And the Defense Logistics Agency had asked them to do the audit just to make sure where these costs were incurred. And they were all incurred at Hampton Roads. But the government received at least over $2.6 million of equipment for all the sites. There was only one site, Your Honor is correct, that was fully installed, which is Hampton's Road. But that tells me, as a matter of evidence, that something was going on which caused this additional money to be spent only for Hampton Roads. And when you change, for example, the location of monitors from 25 to 50, which we also showed the trial court, when you change the card readers on the equipment, what you've done is changed the overall scope of the contract. And that's what we were arguing to the trial court. And the trial court doesn't really go into the details as to what the changes were or weren't. It simply says you didn't show anything. And in point of fact, this record is loaded with the changes that were made, including the DCAA report on how the costs were incurred and when they were incurred. We also had before the trial court the 801 evidentiary admissions, which we wanted the trial court to rule on, with respect to the defense logistic agency's statement to DCAA that ISN was entitled to an equitable adjustment, which is recounted in the audit report. Do you want to save the remaining two minutes? I do. Thank you. Thank you. Counsel for the government. Thank you, Your Honor. It pleased the court. The parties are bound to the express language of their contract. We don't need a lecture on that. Of course they are. Everybody knows that. What's your response to his arguments about what's in the record? Well, Your Honor, we disagree, obviously, with his arguments about what's in the record. First, there's clearly no evidence of any writing or approval by the contracting officer. Well, of course, we all know that. He admits that. So we don't need to repeat that either. And to the contrary, the deposition in the record of Information Systems' own program manager, the January letter from Information Systems, all of the status reports prepared by Information Systems confirm that these changes were never approved by the contracting officer. The evidence is replete. Let's also admit it. He says, nevertheless, he should prevail because it was a constructive change. But in order to prove a constructive change, you need to prove that there was an order or fault of the government by an authorized government official, in this case, the contracting officer. The heart of your position must be that since the contracting officer normally has to approve, and since under this contract he explicitly has to approve, that since he didn't approve, that's the end of the case. And no theory, including constructive change, can produce a contrary result. Yes, Your Honor. I mean, Information Systems proceeded in this case under the clauses which provide for an engineering change proposal and for a modification to the contract. And that modification to the contract was never approved. Moreover, we do agree with the trial court that ultimately Information Systems failed to present to the trial court any evidence of damages or any evidence that the work was not contemplated by the contract. Mr. Major, there seems to be something going on here. The DCAA audit finds that they have incurred enormous costs to do just 30 percent of the work. There's a pattern of delays and difficulty in the work. The government delivers different material, evidently pursuant to an earlier request. There seems to be a great deal of revision going on throughout this process. How do you deal with all that, though? Well, Your Honor, it's because they were terminated for the convenience of the government. I mean, the DCAA had determined in its early audits that Information Systems had severely underbid this contract. However, when terminated for the convenience of the government, they were entitled to their costs. And so ultimately, even though they did approximately $2.2 million worth of contract work, when terminated for the convenience of the government, the government still had to pay them the $4 million that they paid them because their labor costs were extremely excessive. I understand that. But my point is that somehow the government acquiesced in allowing them to go to expend a great deal of money to do 30 percent of the work of the contract. How did we get to that point? Weren't there a lot of constructive changes going on throughout the process is really what I'm asking. No, and they've actually only argued that there was a series of what would be effectively found in the ECP, a series of four constructive changes in the contract for approximately, I believe it is by their allegation, approximately $90,000 equipment for which they seek approximately $890,000 worth of damages. At least that's the closest we can tell. One of the difficulties is the theory information systems presented to the trial court in terms of its damages has changed several times. And at one point, information systems said that $890,000 consisted of all of the costs that they had incurred in this contract. At another point, they had alleged that a portion of that was actually all profit, and approximately $400,000 of that was profit. Ultimately, on the motions for summary judgment, information system relied upon two pieces of evidence to say that they incurred cost. One of those pieces of evidence was the DCA audit, which was expressly qualified. We do agree that to the extent the argument is that their accounting data is, or the government can't take issue with their accounting, that's correct. We can find no problems with their accounting. Let me ask it a slightly different way. If they were so far behind in their work and you had not acquiesced to all those changes, why weren't they T4D'd instead of T4C'd? Well, they considered T4D'ing them. The problem was, and this is in the record, the contracting officer viewed the fact that they had not T4D'd them at an earlier stage meant the government might have waived its right to T4D them. One of the possibilities the government had looked at was attempting to reestablish the schedule with information systems, and if they couldn't meet that schedule, then they would be terminated for default. But ultimately, at the end of the day, the concern was that the government might have raised its right to terminate them for default. Am I remembering correctly that there were numerous communications from the contracting officer's representative to the contracting officer and he virtually never responded to any of them? Well, no. That would be communications from the terminating contracting officer to the contracting officer who administered the contract. When the contract was terminated for the convenience of the government, the government had a terminating contracting officer review their termination settlement. What I'm getting at is that the whole process seems to become farcical. If the contracting officer hides in the weeds and won't respond to anything from anybody, including his own people, and meanwhile the contractor goes out, does a lot of work, spends a lot of money, and then the contracting officer shows up at the end of the day and says, well, I never approved anything personally in writing, so too bad. Well, Your Honor, that- If we affirm, are we just incentivizing bad conduct by contracting officers? No, you aren't. You aren't. In this particular case, the contracting officer- So don't you think the contracting officer should have to respond promptly to his own technical representative and to any other allied official who's working on the contract? When the contracting officer is available, yes. But the problem here was, as the contracting officer provided, is that he was unavailable and on leave at the time that the technical contracting officer was trying to contact him. So he did respond, ultimately. He did not respond within- Are you representing that he responded promptly to everything that was sent to him by other government officials except during a brief period of leave? Well, Your Honor- That's not my recollection of this record at all. The only thing- I suppose you might be referring to another allegation. There's another allegation that the engineering change proposal was sent to the contracting officer and that it was not approved by the contracting officer for a several-month period. But the contracting officer was under no obligation to approve this. Shouldn't a CO be under an obligation to respond? Say yes or say no. Say whatever you're going to say, but say it and say it promptly so everybody knows what's going on. Under the terms of the contract, information systems could have, because this was an engineering change proposal, withdrawn its engineering change proposal as a matter of right if the contracting officer didn't respond. That doesn't respond to the question. Why shouldn't a CO be obligated to respond promptly and professionally to the contractor or to his own representative? Can I make it even more specific? Wasn't he only at three meetings when all these technical changes were discussed? Three meetings over a period of year here in this contract? That is correct, Your Honor. Well, I'm just supplementing my chief judge's commentary. I think it's his question you need to respond to. But, Your Honor, he received the engineering change proposal. Ultimately, he did not approve it. That is clear from the minutes. Because it was an engineering change proposal, he could reasonably rely upon the language of the contract that information systems was not to proceed with those changes until he had approved it. So, in the context of this contract, the contracting officer could rely upon the fact that if he did not approve the engineering change proposal, ISN would not be performing the engineering change proposal. Therefore, he didn't need to respond at all. He could just sit on it forever. And information systems could withdraw its engineering change proposal because an engineering change proposal... How is the contracting system going to work efficiently for the taxpayers, the country, the military that needs the facilities, and so forth, if people don't communicate? If you can't count on the CO to be informed, to go to meetings, to answer proposals promptly, then how can the whole system work the way it's meant to? Your Honor, in this particular case, again, an engineering change proposal would be a proposed improvement to what information systems was planning on doing. Again, to supplement the question, why didn't he just disapprove it then? And then things could have moved forward. Well, because while he believed that it was a technically acceptable proposal based upon the advice of the client agency, Sparwar, ultimately his difficulty was with regards to the pricing of it. Information systems had sought approximately $900,000 for installing about $90,000 worth of equipment. Why didn't he say that on day one? And they could either fix it or not fix it, depending on what they were able to do. And then everybody would be informed of what's going on, and the process would move forward rapidly. Well, Your Honor, in an ideal world, he would have disapproved of it. Well, I don't care about an ideal world. How about the world supervised by law? In the world supervised by law, what he did was within his rights, because information systems was not to- And I once again note that he goes from June 20th of 1995 to March of 1996 with no response. Nine months. Actually, Your Honor, it wouldn't be March of 1996 with no response because they were terminated. Well, that's when they're terminated, but there's no response from June 20th until they're terminated in March of 1996, right? But the engineering change proposal basically could have only been active through January, or rather February when they were terminated. Okay, but I'm kind of saying that I'm a little troubled, too. It seems like there could have been a response. There could have been some kind of communication that would have facilitated, avoided this dispute at least. Well, Your Honor, I can say the record does not provide any information as to why he did not respond, other than with regards to his response to the terminating contracting officer. Can you explain the delay in this case? Some people might be troubled by focusing on the fact that this is a contract from the earlier mid-90s that was terminated in the mid-90s, and it's now 2009, more than a decade later, and we still don't have an answer. We still don't know who was right here. This is a pinnacle. It takes more than a decade to get a final result in a contract dispute? Well, Your Honor, Information Systems previously filed its case in the Court of Federal Claims based upon the theory, among other, raising all of these issues, but based upon one of the theories was that this case had been actually settled and the settlement had been approved. After the court disapproved of that trial court, they dismissed all of their remaining claims and appealed solely that claim to this court. After this court affirmed to the trial court that there indeed was no settlement, that the terminating contracting officer had not entered into a settlement, they then refiled their case in the Court of Federal Claims. The translation is all the delay was the fault of the contract and none the fault of the government? Well, in many ways, it's the fault of, I would not blame any party solely. It's simply, unfortunately, part of the nature of litigation. The parties went through discovery in the subsequent case. After the government had initially filed a motion for summary judgment on another aspect of the claim that Information Systems had brought, parties went through discovery. The case was then, we filed a second motion for summary judgment at the close of discovery on the constructive change argument. Why should anybody want a contract with the government if it's going to take more than a decade routinely to settle any dispute? Well, Your Honor. If I'm the contractor, even if I'm right and I win at the end of the day, it's 13 years later. Well, Your Honor, that presumes, of course, you're right and the government doesn't agree that Information Systems is right. There are methods and throughout the process there were opportunities for this case to be settled. Even if they're wrong, it seems like it should be able to be settled way shy of a decade and a half. Your Honor, in an ideal world, this case would be resolved in more than a decade and a half. Less than a decade. In less than a decade and a half. However, that case would be resolved against Information Systems. All right. Mr. Singer, two minutes to rebut. Your Honor, I would make two points. The June 20, 1995 letter in appendix 81 and 82 confirms that the government will provide all the 12-pair cable needed to perform at Hampton Roads. The government has provided 5,000 feet of new 12-pair cable. So that change from 6-pair to 12-pair was already provided by the government. Along with this letter in appendix 83 is the cost breakout for the difference between the installation of the 6-pair under the contract and the 12-pair, the difference being $623,000. So we installed the 12-pair. The government provided that. And they can't really say that they didn't know about it because, in fact, they were part of the process. The second and last point is in the audit report, again, which is at appendix 483. The DCAA, while it audited and confirmed $4.4 million of costs, it concluded that there were costs in excess of the contract of $460,000. And therefore, the total warranty payment was $4 million. The $460,000 costs incurred, but which the DCAA confirmed were in excess of the contract, is a conclusion we raised with the trial court by a motion in limine on this $460,000, which is pretty much what this case is about. That motion in limine was pending when the motion for summary judgment was filed, and we never had a decision on that, which, again, becomes an issue of fact as to what that $460,000, the conclusion of the DCAA that it was in excess of the contract, what it was based on. Thank you. Thank you both. The case is submitted.